(No. 15107.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* NICHOLAS E. MURRAY, Plaintiff in Error.

*Opinion filed February 21, 1923—Rehearing denied April 6, 1923.*

1. CIVIL SERVICE—*section 22 of City Civil Service act does not violate the constitutional provision for freedom of elections.* Section 22 of the City Civil Service act, prohibiting the solicitation of any contribution from a civil service employee for political purposes, does not violate the constitutional provisions for the freedom of elections and the right to express opinions, as said section does not prohibit voluntary contributions and is a proper safeguard against the collection of forced assessments from employees for political purposes.

2. SAME—*purpose of section 22 of City Civil Service act.* The purpose of section 22 of the City Civil Service act is to protect the independence of civil service officers and employees against subservience to a political machine, whether the attempt to impose it is made directly by those in official authority or indirectly by volunteer managers having no official standing.

3. SAME—*legislature may impose conditions to secure efficient performance of official duties.* A public office is a public trust, and the legislature may impose such conditions as it sees fit upon those to whom public office is intrusted, in order to secure the prompt, efficient, faithful and impartial discharge of public duties.

4. CONSTITUTIONAL LAW—*legislature has ample power to protect public health, safety or welfare.* Wherever a condition exists which is detrimental to the public health, safety or welfare the General Assembly has power to legislate for the purpose of remedying the evil.

5. SAME—*when the courts may interfere with exercise of police power.* Whether an evil exists and what means shall be adopted to prevent it are questions for legislative determination, and the legislature, in remedying the evil, may deem it necessary for the general welfare to restrain to some extent the exercise of a fundamental right, and the courts will not interfere unless the restraint has no reasonable relation to the object sought to be accomplished or is unmistakably arbitrary and oppressive.

6. SAME—*statute which is invalid in one application may remain valid as to another.* A statute may be invalid if applied to one class of objects or persons but valid in another application, and in such case the constitutional part of the act will be given effect and the unconstitutional part disregarded, unless the invalid part is of such a character that it may be inferred that without it the legislature would not have passed the act.

7. WORDS AND PHRASES—*ordinary meaning of term "civil service."* The term "civil service," in its ordinary meaning, includes all branches of the public administrative service which are not military or naval.

8. SAME—*meaning of the word "solicit."* To "solicit" implies a serious request, and means to try to obtain by asking or to ask for the purpose of receiving, but it requires no particular degree of importunity, entreaty, imploration or supplication; and the act of soliciting need not be by word of mouth or writing, but it may be by action which the relation of the parties justifies in construing into a request.

9. CRIMINAL LAW—*what constitutes a violation of section 22 of City Civil Service act.* Section 22 of the City Civil Service act, prohibiting the solicitation of contributions from civil service employees for political purposes, is violated where the evidence shows that the defendant participated in and helped to carry out a plan of having each of the employees in his department purchase fifteen subscriptions to a political newspaper and dispose of them, with the object of refuting alleged false charges against a political faction.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN M. O'CONNOR, Judge, presiding.

LEFORGEE, SCHROEDER & TATE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, CLYDE C. FISHER, and HENRY T. CHACE, JR., of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

In an indictment returned at the December term, 1921, of the criminal court of Cook county, Nicholas E. Murray, the plaintiff in error, was charged with soliciting from Leroy L. Hunter, an officer and employee in the classified civil service of the city of Chicago, an assessment, contribution and payment of $30 for a party and for political purposes. The indictment alleged that the city of Chicago had adopted the City Civil Service act. (Hurd's Stat. 1921, p. 524.) The defendant waived a trial by jury, the cause was tried by the court, the defendant was found guilty and fined $100. He sued out this writ of error, and alleges, among other things, that section 22 of the City Civil Service act, under which he was convicted, violates sections 17 and 18 of article 2 and section 13 of article 4 of the constitution.

The constitutionality of the City Civil Service act as a whole is not drawn in question but only section 22, which contains the particular provision which is the basis of the indictment against the plaintiff in error. The constitutionality of the act was assailed soon after its passage, in 1895. The adoption of its foundation principles of appointment to municipal office or employment according to merit and fitness, to be ascertained by competitive examination, and of promotions upon the basis of merit, was held to be within the power of the legislature, and the act as a whole was held constitutional with the exception of section 35. (*People* v. *Kipley*, 171 Ill. 44.) A few months later another attack was made upon the act and new grounds for holding it unconstitutional were advanced, but its constitutionality was again affirmed. (*People* v. *Loeffler*, 175 Ill. 585.) In

neither of these cases was the particular section on which this prosecution is based considered, but in the latter case it was said: "It is furthermore claimed that the Civil Service act denies to the citizens the freedom of political action and makes it highly penal for them to take part in politics. This contention has reference to sections 21 to 28, inclusive, of the Civil Service act. The design of these sections is to prevent the solicitation of political contributions, and the levying of political assessments, and the abuse of official influence, and the purchase of positions in the public service. The constitutionality of these sections is not directly involved in this litigation. It is not contended that the present respondent, the city clerk, has been guilty of any violation of the sections last referred to. It will be time enough to consider their validity when a case arises under either of them which calls properly for their consideration."

The constitutionality of section 22 is directly involved in this case. That section, and sections 17 and 18 of article 2 of the constitution, are as follows:

"Sec. 22. No person shall solicit, orally or by letter, or be in any manner concerned in soliciting any assessment, contribution or payment for any party or any political purpose whatever, from any officer or employee in any department of the city government of any city which shall adopt this act."

"Sec. 17. The people have the right to assemble in a peaceable manner to consult for the common good, to make known their opinions to their representatives, and to apply for redress of grievances.

"Sec. 18. All elections shall be free and equal."

It is argued that section 22 violates these provisions of the constitution because it attempts, practically, to remove from the stream of public life and opinion the employees of the city and put them outside the class of the ordinary citizen and voter by placing them in a position where an attempt of others to co-operate with them for the promotion

of any public question is virtually prohibited and the aid which they might be requested to give to a political movement is practically interdicted because a request for it is prohibited. There is nothing in the section which prohibits any employee contributing to whatever extent he may desire to any party or political purpose he sees fit, and no employee is complaining that he was denied the opportunity to contribute or to be requested to do so. The civil service employee is not complaining of any infringement of his constitutional right to contribute to a political party or to co-operate in bringing about its success, but the complaint is made by the person charged with requesting him to make the contribution that he was prohibited from making the request.

Civil service laws requiring appointments and promotions in the civil service to be made according to merit and fitness instead of by way of division of the loot of a political campaign are of comparatively recent origin in this country. Such laws have been enacted by the Federal Congress and by the legislatures of various States, and while their constitutionality has been questioned they have in general been sustained, as in this State. The first of these laws was the act of Congress passed in 1876, and it contained a provision somewhat similar to that in question here. The prohibition of that act applied only to officers or employees of the government and not to every person, as does the section here in question, and it applied to both the giving and receiving of money and not merely to the solicitation, as in the section of our act. This provision of the act was held a proper exercise of legislative power, and in regard to it the court said: "The evident purpose of Congress in all this class of enactments has been to promote efficiency and integrity in the discharge of official duties and to maintain proper discipline in the public service. Clearly, such a purpose is within the just scope of legislative power, and it is not easy to see why the act now under consideration

307–23

does not come fairly within the legitimate means to such an end. It is true, as is claimed by the counsel for the petitioner, political assessments upon officeholders are not prohibited. The managers of political campaigns not in the employ of the United States are just as free now to call on those in office for money to be used for political purposes as ever they were, and those in office can contribute as liberally as they please, provided their payments are not made to any of the prohibited officers or employees. What we are now considering is not whether Congress has gone as far as it may, but whether that which has been done is within the constitutional limits upon its legislative discretion. A feeling of independence under the law conduces to faithful public service, and nothing tends more to take away this feeling than a dread of dismissal. If contributions from those in public employment may be solicited by others in official authority it is easy to see that what begins as a request may end as a demand, and that a failure to meet the demand may be treated by those having the power of removal as a breach of some supposed duty growing out of the political relations of the parties. Contributions secured under such circumstances will quite as likely be made to avoid the consequences of the personal displeasure of a superior as to promote the political views of the contributor; to avoid a discharge from service—not to exercise a political privilege. * * * If there were no other reasons for legislation of this character than such as relate to the protection of those in the public service against unjust exactions, its constitutionality would, in our opinion, be clear, but there are others, to our minds, equally good. If persons in public employ may be called on by those in authority to contribute from their personal income to the expenses of political campaigns and a refusal may lead to putting good men out of the service, liberal payments may be made the ground for keeping poor ones in. So, too, if a part of the compensation received for public services must be con-

tributed for political purposes, it is easy to see that an increase of compensation may be required to provide the means to make the contribution, and that in this way the government itself may be made to furnish, indirectly, the money to defray the expenses of keeping the political party in power that happens to have for the time being the control of the public patronage." *Ex parte Curtis,* 106 U. S. 371.

The legislature evidently believed that in order "to promote efficiency and integrity in the discharge of official duties and to maintain proper discipline in the public service" it was desirable that the officers and employees in the civil service of the city should be exempt from solicitations of contributions of money for political purposes,—not only solicitation from their superior officer or their fellow-employees, not only in the city buildings or offices of the city government, but solicitations from all persons at all times and in all places. The "spoils system," in the flower of its perfection, operates not only in the offices and places where the public business is conducted, and not only through the officers in whom the law has invested the appointing power; it operates at all times and places, and its agents are not only the agents appointed by law, but beyond and above them are the chiefs of the victorious party,—the leaders of the volunteer organization which controls official appointments and at whose direction offices and places of employment are given to faithful followers for political services and taken away from meritorious employees. The purpose of the law is to protect the independence of civil service officers and employees against subservience to a political machine, whether the attempt to impose it is made directly by those in official authority or indirectly by volunteer managers having no official standing. If the managers of political campaigns are permitted to call on office-holders or employees to contribute money to be used for political purposes,—if they may make and collect assessments of such proportion of the employee's salary or wages

as are deemed proper or they think they can collect,—it is little protection to the harassed employee that payment of the assessment cannot be solicited of him by a fellow-employee or in the place where he is at work. Possibly he will fail to appreciate the benevolence of the constitutional provision which protects him in the right to be assessed for the propagation of the political principles which the administration is advocating in the particular election. No one can question the necessity or propriety of raising money for political purposes; no one can defend the propriety of raising it by an assessment upon or forced contribution from persons engaged in the public service or by what may present itself to such persons as an involuntary assessment or contribution.

That a public office is a public trust is a principle of law as well as a political maxim. The legislature may impose such conditions as it sees fit upon those to whom public office is intrusted in order to secure the prompt, efficient, faithful and impartial discharge of public duties. Parties or groups of citizens have the right to organize for concerted action and to give to and solicit and receive from each other money for use in advancing their political purposes; but the exercise of these rights, like all others, may be limited when such exercise is prejudical to the public health, safety or welfare. Many acts which are of themselves harmless and in the absence of a statute perfectly lawful are rightfully prohibited and punished when they afford facilities and a disguise for doing that which is harmful. The possession of a quail or pike lawfully killed or caught in another State is a harmless thing, yet it is within the legislative power to prevent such possession for the better enforcement of the laws for the protection of fish and game in this State because of the facility such possession would afford for the evasion of those laws. (*Magner* v. *People,* 97 Ill. 320; *People* v. *Booth Fisheries Co.* 253 id. 423.) So the request of a political contribution from a

civil service employee may be harmless of itself, but it affords every facility for disguising the collection of a forced assessment and for this reason may properly be prohibited.

"Elections are free where the voters are subjected to no intimidation or improper influence and where every voter is allowed to cast his ballot as his own judgment and conscience dictate. Elections are equal when the. vote of every elector is equal, in its influence upon the result, to the vote of every other elector,—when each ballot is as effective as every other ballot." (*People* v. *Hoffman*, 116 Ill. 587.) The right of no person to vote at any election is restricted by this act and the equal effect of no ballot is affected, but it is claimed that political conditions are rendered unequal and political rights are impaired and the right to participate most effectively and most potently in public affairs is hampered and embarrassed by denying the right of any political group to approach any citizen and request a contribution from him. The right of the State to prescribe the conditions of appointment to its civil service cannot be denied, and in *Ex parte Curtis, supra,* the court recognized the propriety of legislation for the purpose of protecting the employees from being compelled to make contributions for political purposes through fear of dismissal if they refused. Section 22 merely extends the protection so as to reach all methods of compulsion, whether direct or indirect. The existence of the evil has been recognized for many years and in many States, and in this State, as well as in many others, civil service laws have been passed for the purpose of correcting it. Wherever a condition exists which is detrimental to the public health, safety or welfare the General Assembly has power to legislate for the purpose of remedying the evil. All rights are subject to this power of legislation for the public health, security and welfare. It is a question for legislative determination whether an evil exists and what means should be adopted to prevent it, and the acts of the legislature will not be interfered with un-

less they are clearly in violation of some constitutional limitation. (*Stewart* v. *Brady*, 300 Ill. 425; *People* v. *Stokes*, 281 id. 159; *People* v. *Elerding*, 254 id. 579; *People* v. *McBride*, 234 id. 146.) If, in applying the remedy for an evil which it finds to exist, the legislature has deemed it necessary for the general welfare to restrain to some extent the exercise of a fundamental right, the courts will not interfere unless the restraints have no reasonable relation to the object sought to be accomplished. The question of the necessity of the legislation is for the legislature, and the courts interfere with its determination only where the result is clearly and unmistakably arbitrary and oppressive. (*Schmidinger* v. *Chicago*, 226 U. S. 578; *Eubank* v. *Richmond*, id. 137; *Chicago, Burlington and Quincy Railroad Co.* v. *McGuire*, 219 id. 549; *McLean* v. *Arkansas*, 211 id. 539; *Mugler* v. *Kansas*, 123 id. 623.) In *Booth* v. *Illinois*, 184 U. S. 425, the statute of Illinois which prohibited dealing in options to buy or sell grain was held to be within the constitutional power of the legislature though it prohibited a calling which in itself involved no element of immorality. The Supreme Court of the United States in affirming the judgment of this court said: "A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily or often done in pursuing that calling may be towards that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object but is a clear, unmistakable infringement of rights secured by the fundamental law." The soliciting of contributions to a political party is not of itself harmful to society, but such

solicitation from civil service employees may result in destroying the political freedom of the employees and making their positions dependent upon their political activity. The legislature, deeming this an evil which should be redressed, provided a remedy by prohibiting the solicitation of contributions from officers or employees of the city government. It had the authority to decide whether there was an evil to be remedied and the nature of the remedy, and its decision cannot be said to be so clearly arbitrary or oppressive or unrelated to the evil sought to be remedied as to justify the interference of the courts.

Section 13 of article 4 of the constitution provides: "No act hereafter passed shall embrace more than one subject, and that shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed." The title of the City Civil Service act is, "An act to regulate the civil service of cities," and it is contended that this title directs the attention to only one subject,—the regulation of the civil service of cities,—and that the civil service of cities has to do with the qualification for appointment by examination, promotion on the basis of examination, standardized salaries according to grade of the employee, and freedom from being discharged for political or religious reasons, but that there is nothing in the title which would indicate the intention of the act to control, generally, the subject of campaign contributions as to all city officers and employees, and therefore section 22, which is aimed to prevent solicitation not only from those within the provisions of the act but from all persons employed by the city, is unconstitutional.

Some of the lexicographers' definitions of "civil service" are: "The departments of the public service that are under executive control, that is, neither military nor naval; all service rendered to and paid for by a State or nation other than that pertaining to military, naval, legislative and judi-

cial affairs; all branches of the public administrative service which are not military or naval." (Standard Dict.; Webster's New Int. Dict.) Mr. Justice Story, in construing the words "civil officers" as used in the constitution of the United States, says: "The sense in which the term is used in the constitution seems to be in contradistinction to military." And again: "All officers of the United States, therefore, who hold their appointment under the national government, whether their duties are executive or judicial, in the highest or in the lowest department of the government, with the exception of officers in the army and navy, are properly civil officers within the meaning of the constitution." (Story on the Constitution, secs. 791, 792.)

It is claimed that section 22 would be unconstitutional if applied to officers and employees in the civil service outside the classified civil service of the city, but we do not consider that question because it is immaterial. In any event, the objection can be of no benefit to the plaintiff in error. In the charge against the plaintiff in error it is alleged that Leroy L. Hunter, the person solicited, was an officer and employee in the classified civil service of the city of Chicago. He was therefore within the title and the body of the act. Section 13 of article 4 expressly declares that if any subject shall be embraced in an act which shall not be expressed in the title the act shall be void only as to so much of it as shall not be so expressed. Therefore, even though section 22 should be regarded as improperly including officers and employees not in the classified service it would be void only as to them but its provisions as to those within its classified service would not be affected. It is a settled rule that a statute may be in part constitutional and in part unconstitutional, and that in such case the constitutional part of the act will be given effect and the unconstitutional part disregarded, if they are separable, unless the unconstitutional part is of such a character that it may be inferred that without it the legislature would

not have passed the act. (*Scown* v. *Czarnecki*, 264 Ill. 305; *Commonwealth* v. *Gagne*, 153 Mass. 205; *Commonwealth* v. *Kimball*, 24 Pick. 359; *State* v. *Amery*, 12 R. I. 64.) So it was held in the case first cited, that the provision of the Woman's Suffrage act authorizing women to vote upon all questions or propositions submitted to a vote of the electors of municipalities or other political divisions of the State was unconstitutional so far as it authorized women to vote at elections upon such questions provided for in the constitution but valid in so far as it applied to elections on propositions provided for by statute. Section 12 of the Fish and Game law of 1911, (Laws of 1911, p. 348,) which prohibited the transportation to any point outside the State of certain kinds of fish, was held unconstitutional so far as it concerned fish which had been shipped into Illinois but constitutional so far as it concerned fish which had been caught in this State. *People* v. *Booth Fisheries Co. supra.*

It is contended that the facts do not show a solicitation by the plaintiff in error of a contribution, or a contribution or an assessment made. The case was submitted upon a stipulation of facts, together with the testimony of Leroy L. Hunter that he was employed by the city of Chicago in the department of local improvements under the provisions of the Civil Service act, having entered that employment in December, 1906; that he had since received various promotions under the provisions of that act, and that he worked under the plaintiff in error, who was superintendent of sidewalks. Other facts stipulated were that the plaintiff in error entered the service of the city of Chicago on September 1, 1897, under the terms of the Civil Service act, and during the year 1921 continuously held the position of superintendent of sidewalks; that Hunter during the month of May, 1921, and for about nine years previous, occupied the position of civil engineer in the sidewalk department of the city of Chicago, being appointed under the provisions of the Civil Service act; that early in May, 1921, a meeting

of all the employees of the board of local improvements, embracing more than four hundred persons, the majority being under the Civil Service act, was called. It was not called at the suggestion of the plaintiff in error and he did not participate in and was not consulted as to the calling of such meeting and did not know its purpose and was not operating with any other person in relation to fixing the meeting or its object and purpose. During the early part of May, prior to that meeting, the plaintiff in error was informed by his assistant that a member of the board of local improvements desired a meeting of the various division heads in the plaintiff in error's department, and that the meeting was to be held at four o'clock in the afternoon of the day the plaintiff in error was informed of it. The purpose of the meeting was not disclosed to the plaintiff in error and there was no discussion or reference to its purpose and the plaintiff in error did not attend the meeting. The next morning the plaintiff in error was informed by his assistant that the meeting had been held. Several days afterward the plaintiff in error was called into the room of a member of the board of local improvements, where he found various other heads of departments assembled. A member of the board advised them to notify the employees in their departments that a meeting of the employees would be held in the board room upon a date named and that at this meeting an explanation would be made as to its purpose and object. The plaintiff in error communicated this information to his assistants, and Hunter was one of those notified, but he did not attend any of the meetings. At the meeting last referred to, an attorney connected with the board of local improvements made an explanation of the purpose of the meeting, stating that publicity was desirable and necessary to refute certain alleged false charges that were then being made in a certain part of the public press against some of the employees of the board of local improvements, and that such publicity could be obtained

through the columns of *The Republican,* which would present the facts. Thereupon the names of the employees present were read and the number of the books of subscription and the amount thereof assigned to each employee was announced by someone other than plaintiff in error. The plaintiff in error was requested to ascertain how many employees operating under him were present, and he thereupon called the names of the employees in his department, who were about forty, and all were present except Hunter and one other. The attorney further said that it was desired that publication should be made in *The Republican* refuting the charge made in relation to the board of local improvements, and it was suggested that subscriptions be secured by members of the department and the circulation of the newspaper thereby increased, and that subscription books would be left with the heads of divisions, where the employees could call for the same if they wished to do so. After the meeting, but not on the same day, the plaintiff in error was sent for by an employee of the board of local improvements and given a number of books of subscription. The stipulation continues that Hunter states, and would testify upon the trial, that several days after this meeting the plaintiff in error stated to McCauley, an employee of the department, in the presence of Hunter, that the subscriptions "would cost you $20; it will cost Hunter $30 and me $50;" that the plaintiff in error states, and will testify, that this conversation did not occur as stated by Hunter; that he had been careful throughout the entire proceedings not to mention in the city hall or elsewhere the matter of the sale of said subscriptions; that he was not down on any list for subscriptions of $50 and that he did not take or pay for $50 worth; that McCauley states, and would testify, that he has no recollection of the conversation but would not say it did not occur. About three days after this conversation is alleged to have taken place, Hunter came to the desk of the plaintiff in error and asked

him who was handling "this business," referring to the subscriptions. The plaintiff in error replied, "I am." Thereupon Hunter asked the plaintiff in error, "How many more assessments like this are you going to stand for?" and the plaintiff in error replied he didn't think he would stand for many more. The plaintiff in error states, and would testify, that such a conversation did not take place as testified to by Hunter. Hunter then gave the plaintiff in error $30 and received three of the books of subscription. The plaintiff in error later delivered the $30 to a member of the board of local improvements. The plaintiff in error at the time he received the $30 checked off the name of Hunter from the list of employees of his department which plaintiff in error then and there had and had received from said member of the board of local improvements, and wrote upon the list, after Hunter's name, the serial numbers on the subscription books received by Hunter. Three employees in the division of which the plaintiff in error is the head took no books of subscription, and two of those employees are still employees and the third has since died. All the money received by the plaintiff in error was delivered by him to the member of the board of local improvements from whom he received the books. *The Republican* was a weekly newspaper having a circulation prior to May 15, 1921, of approximately 30,000, which was increased during May and June to 50,000; that it circulated by hand and through the mails, largely in Cook county, and devoted considerable space in its columns to advocating and promoting the interests and principles of the Thompson faction of the republican party, of which fact the plaintiff in error had knowledge. Three copies of the paper were attached to the stipulation. Each of the three books which Hunter received, containing five subscriptions to *The Republican,* entitled the holder to *The Republican* once a week for a year. Hunter sold one of the books to a hotel owner in the city of Chicago and received for it $10, a second to R. E. Black-

wood, for which he received $10, and three subscriptions from the other book to various persons, for which he received $6. He retained two subscriptions, for which he paid of his own funds $4.

*The Republican* was a political newspaper. The ostensible purpose of publishing the facts in the newspaper for the purpose of refuting alleged false charges in relation to the board of local improvements was a political purpose. The payment of $30 for this purpose was a contribution, though the contributor was given the opportunity of indemnifying himself, partially or wholly, by receiving fifteen subscriptions to *The Republican,* which he could transfer, but it is contended that the plaintiff in error did not solicit the contribution. This argument is founded to some extent on the counsel's definition of the word "solicit" as meaning "to importune; entreat; implore." "Solicit" has all these meanings, but solicitation does not require any great degree of earnestness or persistence in preferring the request. Solicitation is not necessarily by word of mouth or writing. It may be by action ·which the relation of the parties justified in construing into a request. To "solicit" implies a serious request. It is to try to obtain by asking; to ask for the purpose of receiving. It requires no particular degree of importunity, entreaty, imploration or supplication. To ask alms is to solicit alms, and to ask money, a favor or a contribution is to solicit them. The section under consideration forbids being in any manner concerned in soliciting a contribution, and the Criminal Code provides that whoever aids, abets, assists, advises or encourages the perpetration of a crime is an accessory and shall be considered as a principal and punished accordingly. The meeting at which it was determined that all the employees of the department should make a contribution for the purpose of increasing the circulation of *The Republican,* though it was not called by the plaintiff in error and he was not consulted about it or its purpose, was attended by him. He notified the em-

ployees in his department of it; he called the roll of the employees of his department, who were all present but two; he heard the names of employees read and the assessment of the number of subscription books assigned to each employee and their cost; he heard the suggestion that subscriptions be secured by members of the department and that subscription books would be left with the heads of divisions, where the employees could call for the same if they wished to do so; he accepted from the member of the board of local improvements the subscription books for his department, and received from him at the same time a list of the employees of his department. Afterward, when Hunter came to his desk and asked who was handling the business of these subscriptions, the plaintiff in error replied that he was, and Hunter gave him $30 and received the three subscription books, whereupon the plaintiff in error checked Hunter's name off the list of employees which he had received, wrote upon the list, after Hunter's name, the serial numbers of the subscription books which Hunter had received, and delivered the $30 to the member of the board of local improvements.

It is clear that the meeting was arranged for the purpose of informing the four hundred employees of the department of the assessment on them of the amount of the subscriptions to *The Republican,* and the statement then made to them of the number of subscriptions assigned to each not only was a solicitation of so much money, but might well be considered as a request or demand with which each one would be expected to comply. While the plan no doubt originated with some other person, the plaintiff in error accepted the part assigned to him as the distributor of the books and collector of the funds, and all who were engaged in carrying out the plan were equally guilty of a violation of the law. Hunter was not present at the meeting when notice of the assessment was given, but the notice reached him with the same effect as if he

had been present, and those who put it in motion are responsible for its effect. That the plaintiff in error was in charge of the business of the subscriptions is manifest, whether or not he is to be regarded as denying the statement of Hunter that he said he was, in answer to Hunter's question. The stipulation was that the plaintiff in error would testify that such a conversation did not take place as stated by Hunter. This is a somewhat evasive denial and does not necessarily imply a denial of the statement that he was in charge of this business. It is, however, immaterial, for it is evident from what occurred that he was in charge of the business.

The evidence justified the court in finding the plaintiff in error guilty, and the judgment will be affirmed.

*Judgment affirmed.*